J-A04043-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.E., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: D.B.-M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1368 MDA 2022 |

Appeal from the Order Entered August 23, 2022
In the Court of Common Pleas of York County Juvenile Division at No(s):
CP-67-DP-0000159-2022

BEFORE:  STABILE, J., DUBOW, J., and McCAFFERY, J.

MEMORANDUM BY McCAFFERY, J.:        **FILED: MAY 15, 2023**

Appellant, D.B.-M. ("Mother"), files this appeal from the order entered August 23, 2022, in the York County Court of Common Pleas, adjudicating A.E., born in February 2007 (Child), dependent and establishing subsidized permanent legal custody[1] (SPLC) as Child's permanency goal with a concurrent goal of adoption.[2]  After review, we affirm in part, vacate in part, and remand to the juvenile court.

---

[1] **See** Pa.C.S. § 6351(f.1)(3) (SPLC is one of the goals a court may consider at a permanency review hearing).  "SPLC transfers permanent legal custody to the [dependent] child's legal custodian without requiring the termination of . . . parental rights.  When deemed appropriate, the trial court has the power to permit continued visitation by the [dependent] child's . . . parents." **In re B.S.**, 861 A.2d 974, 977 (Pa. Super. 2004).

[2] Child's father did not file an appeal and is not a party to the instant appeal.

Mother and Father are the biological parents of Child. Mother and Father separated in 2009 after a seven-to-eight-year relationship, and Father has not seen Child since she was three years old. *See* N.T., 8/23/22, at 55.

Pursuant to a 2011 order from Virginia, Mother was awarded custody of Child. *See* Mother's Exhibit 2. From 2010 to 2019, Child resided in Virginia with Mother; her stepfather, D.-B.M. (Stepfather), whom Mother married in 2010;[3] and her two older brothers. *See* N.T. at 41-43.

Mother acknowledged issues with alcohol commencing in 2017. *See* N.T. at 44. Following Mother's arrest and incarceration in 2019 for her third DUI,[4] a felony, Stepfather placed Child with guardians, Sar.B. and Sam.B.[5] (Guardians), in York County, Pennsylvania, who were his mother and cousin.[6] *Id.* at 42, 44, 46-47, 60. Prior to her incarceration, in approximately May 2019, Mother had placed Child's brother, Au.E., with Guardians.[7] *Id.* at 38,

---

[3] Mother and Stepfather have since filed for divorce. *See* N.T. at 42-43.

[4] Mother was arrested and incarcerated in December 2019 and eventually released on bail. *Id.* at 6, 46. She then ultimately reported in February 2021 for a period of three months incarceration with a subsequent period of probation that ends in 2026. *Id.* at 46, 51.

[5] Sam.B. is now deceased. *See* N.T. at 42.

[6] Stepfather is in the Navy and was leaving for a new command. His orders did not allow Child to accompany him because he was not an adoptive parent. *See* N.T. at 43, 46.

[7] Mother placed Au.E., who had Attention Deficit Hyperactivity Disorder (ADHD), with Guardians as she understood Sam.B. had experience in special
*(Footnote Continued Next Page)*

43-44. As best we discern, other minor children resided in the home as well. *See* Order of Adjudication and Disposition, 8/23/22, at 1.

Mother allowed Child to remain with Guardians after her release from incarceration, explaining, "[S]ince she was already there, I didn't want to pull her back down here and have her start school where we were and then go and stay with a friend of mine and take the chance of starting another school, so the plan was to leave her there. . . ." N.T. at 47. Mother testified to a subsequent discussion in February 2022 about Child returning home where Child was "very adamant about wanting to stay [with Guardians] because her friends were there. She had a job. She does color guard, and she likes the school that she's in." *Id.* at 39, 49. Not wanting to further "traumatize" Child and "force her to come home," Mother allowed Child to remain. *Id.* at 39-40, 58.

Thereafter, York County Office of Children, Youth & Families (CYF or the Agency) obtained emergency protective custody of Child on July 27, 2022, following a report alleging sexual abuse of Child by Guardians. *See* Order of Adjudication and Disposition at 1. As summarized by the juvenile court:

> On or about July 26, 2022, [CYF] received a referral regarding the minor child[] due to allegations of sexual abuse of [Child] by [] Guardians, [Sar.B.] and [Sam.B.], now deceased. Allegations received were that the legal guardians[] coerced and encouraged

_____

education and working with children. *See* N.T. at 43-44. Au.E. returned to Mother in February 2022. *Id.* at 38.

[Child] to engage in sexual acts and behaviors with other minors that were in the home.

A prior minor household member, T.J., underwent a forensic interview at the Children's Advocacy Center [(CAC)] and confirmed the allegations that the legal guardians[] were directing and observing the sexual abuse of the children in the home. T.J. is currently a dependent child and was previously removed from the home. It was previously believed that [Child] was an alleged perpetrator of abuse of T.J.; however, after the disclosures made in the CAC interview, [Child] is now believed to be a victim herself. After initial disclosures were made by T.J., [Sam.B.] committed suicide.[8]

*Id.* CYF placed Child in foster care, where she has remained since. *See* Order for Emergency Protective Custody, 7/27/22.

On August 9, 2022, CYF filed a dependency petition pursuant to the Juvenile Act, 42 Pa.C.S. § 6301, *et seq*. The court held an adjudicatory and dispositional hearing on August 23, 2022. Mother, who was represented by counsel, Father, and Stepfather were present. The court conducted an *in camera* interview of Child, then 15 years old, who was represented by a guardian *ad litem* (GAL). The Agency presented the testimony of R.M., foster mother, and proffered Mother's Exhibits 1 and 2, which were admitted without objection.[9] Mother presented the testimony of Agency caseworker, Nicole

_____

[8] The investigation received by CYF named Sar.B. as an alleged perpetrator and a referral was made to law enforcement. *See* N.T. at 33. The record does not provide information on the outcome of that investigation.

[9] We observe that after the *in camera* interview with Child and testimony of her foster mother, the court indicated it had heard enough to determine dependency. *See* N.T. at 19-20 ("At this point[,] I've heard enough to find the child dependent.").

- 4 -

Cuevas-Rios, who testified *via* Zoom. Mother additionally testified on her own behalf.[10]

Child testified to her desire to remain in her foster home. *See* N.T. at 6. She further indicated that she did not want to see or have contact with Mother. *Id.* at 8. Likewise, in response to inquiry from the court, Child's GAL expressed her opinion that Child remain in her current placement. *See* N.T., 8/23/22, at 62-63. Additionally, Cuevas-Rios recommended a primary goal of SPLC and concurrent goal of adoption. *Id.* at 34. When asked why she would not recommend a primary goal of reunification, Cuevas-Rios explained, "The child does not want to have any type of contact with any of the family. She stated she doesn't feel comfortable with them, and she doesn't want to work with them. She wants no visits." *Id.* at 35. Notwithstanding, while arguing for continuing placement in the foster home, counsel for the Agency stated as follows regarding Child's permanency goal:

> As far as the goal goes, I mean, again we're willing to do the [Interstate Compact on the Placement of Children (ICPC)[11]]

---

[10] Father also testified, stating he "want[s] what is best for" Child. N.T. at 61.

[11] An ICPC has been explained as follows:

> As drafted, the [ICPC] provides for notification of appropriate state or local authorities in the receiving state before placement by out-of-state persons and agencies. The authorities in the receiving state are given the opportunity to investigate, and if satisfied, must notify the sending state that the proposed placement does not appear to be contrary to the child's interest. After a placement

*(Footnote Continued Next Page)*

request, I don't know if reunification with Mother or Father or [Sar.B.] would be in this child's best interest, but I know that is really right now the least of the agency's worries. We just want to make sure she's safe, and whatever goal is established we will work towards that.

*Id.* at 19.

By order entered August 23, 2022, the court adjudicated Child dependent and established SPLC as Child's permanency goal with a concurrent goal of adoption. The court determined Child was to remain in her current foster placement. The court further granted therapeutic supervised visitation and the commencement of the ICPC process. The court stated:

I do find she's dependent. Visits with either parent will be therapeutic only. I'm setting the primary goal as . . . SPLC. . . . That's it. And the concurrent goal is adoption.

In talking with [Child], she's been independent for five years or close to it, so at this point to try to order reunification is like five years too late, and I just don't see it being realistic, particularly given [Child]'s -- when I interviewed [Child], she was very timid and very afraid. It was clear that she was suspicious of all adults, afraid of everybody she has ever lived with, and super afraid of her mother. So reunification is just not realistic.

*Id.* at 63. In further clarifying its reasoning with respect to the permanency goal and responding to Mother's contention that it was merely pandering to Child's preference, the court explained:

---

has been made, the sending state continues to have financial responsibility for support and retains jurisdiction over the child.

*McComb v. Wambaugh*, 934 F.2d 474, 480 (3d Cir. 1991); *see also* 62 P.S. § 761; 55 Pa. Code § 3130.41. "Although not binding on us, we may cite federal authority for its persuasive value." *Toppy v. Passage Bio, Inc.*, 285 A.3d 672, 690 n.7 (Pa. Super. 2022).

- 6 -

I appreciate your argument. I want to make a couple things clear. Number one, the agency is more than willing to seek an ICPC. I have no problem with that effort being made. Secondly, I want to make it very clear that it is not [Child]'s preference I'm honoring. I disagree. Her state of mind was that of someone who was frightened and traumatized, and it is that state of mind, not her preference, that has caused me to make the goal that I did.

*Id.* at 64.

Thereafter, on September 20, 2022, Mother, through counsel, filed a timely notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Mother raises the following issues for our review:

I. Whether or not the lower court erred when it adjudicated the minor child dependent without clear and convincing evidence[?]

II. Whether or not the lower court abused its discretion when it established a primary goal of permanent legal custodian and a concurrent goal of adoption after adjudicating the minor child dependent[?]

Mother's Brief at 4 (unnecessary capitalization omitted).[12]

Our standard of review for dependency cases is as follows:

[T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record[] but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

---

[12] CYF and Child's GAL filed a joint appellee's brief, arguing that there was clear and convincing evidence to adjudicate Child dependent and competent evidence to establish a goal of SPLC with a concurrent goal of adoption.

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010) (citations omitted); *see also In the Interest of L.Z.*, 111 A.3d 1164, 1174 (Pa. 2015). As this Court previously explained:

> In dependency proceedings our standard of review is broad. Nevertheless, we will accept those factual findings of the trial court that are supported by the record because the trial judge is in the best position to observe the witnesses and evaluate their credibility. We accord great weight to the trial judge's credibility determinations. Although bound by the facts, we are not bound by the trial court's inferences, deductions, and conclusions therefrom; we must exercise our independent judgment in reviewing the court's determination, as opposed to its findings of fact, and must order whatever right and justice dictate.

*In re S.J.-L.*, 828 A.2d 352, 355 (Pa. Super. 2003) (citations & quotation marks.

> [T]o adjudicate a child dependent, a trial court must determine, by clear and convincing evidence, that the child:
>
> > is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk.[13]
>
> 42 Pa.C.S.[] § 6302. "Clear and convincing" evidence has been defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of facts to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.

---

[13] This includes "evidence of the parent's, guardian's or other custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk." 42 Pa.C.S. § 6302(1).

In accordance with the overarching purpose of the Juvenile Act[, t]o preserve the unity of the family wherever possible, a child will only be declared dependent when he is presently without proper parental care and when such care is not immediately available. This Court has defined "proper parental care" as that care which (1) is geared to the particularized needs of the child and (2) at a minimum, is likely to prevent serious injury to the child.

*In re A.B.*, 63 A.3d 345, 349 (Pa. Super. 2013) (citations & some quotation marks omitted).

Moreover, "a finding of dependency can be made on the basis of prognostic evidence and such evidence is sufficient to meet the strict burden of proof necessary to declare a child dependent." *In re R.W.J.,* 826 A.2d 10, 14 (Pa. Super. 2003). Further, in *Matter of DeSavage*, 360 A.2d 237 (Pa. Super. 1976), this Court rejected the argument that a child cannot be adjudicated dependent unless the child is actually in custody of the parents, and they are shown unable to render care or control as defined in the Juvenile Act. We stated:

Obviously, state interference with a parent-child relationship is a most serious intrusion . . . such an intrusion is properly tolerated only in cases in which the Commonwealth sustains a very strict burden of proof. . . . The rule of law appellants request us to announce is overly restrictive. The legislature defined ["dependent child"] in exceedingly broad terms precisely because it is impossible to foresee all the possible factual situations that may arise. Further the broad definition enables the experienced juvenile court judge to apply his training and compassion to the unique facts of each case. The proposition asserted by appellants would compel the juvenile court judge to place the child in the home of the natural parents to determine whether they are able to render proper care, and ignores the possibility that if the "experiment" proves unsuccessful, the consequences to the child could be seriously detrimental or even fatal.

*Id*. at 241-42.

As to an adjudication of dependency, the Pennsylvania Supreme Court has further explained:

> [I]t is the duty of the trial court to determine whether the non-custodial parent is capable and willing to render proper parental control prior to adjudicating a child dependent. If the court determines that the custodial parent is unable to provide proper parental care and control "at this moment" and that the non-custodial parent is "immediately available" to provide such care, the child is not dependent under the provisions of the Juvenile Act. Consequently, the court must grant custody of the allegedly dependent child to the non-custodial parent. Once custody is granted to the non-custodial parent, "the care, protection, and wholesome mental and physical development of the child" can occur in a family environment as the purpose of the Juvenile Act directs. 42 Pa.C.S. § 6301(b).

*In Re M.L.*, 757 A.2d 849, 851 (Pa. 2000), *quoting In the Interest of Justin S.*, 543 A.2d 1192, 1200 (Pa. Super. 1988). *See also In re S.J.-L.*, 828 A.2d 352, 355-56 (Pa. Super. 2003) (affirming order terminating dependency and placing child with father without a hearing as the child was not dependent as father was "immediately ready, willing, and able to provide parental care and control").

With her first issue, Mother argues that the juvenile court erred in adjudicating Child dependent as Mother was ready, willing, and able to care for Child. *See* Mother's Brief at 17-21. Mother asserts that the court adjudicated Child dependent without any investigation or verification of the allegations against her. She raises a failure of the Agency to communicate with her and obtain any information. *See id.* at 18-19. While admitting her alcohol addiction was traumatizing for Child, Mother further challenges the

juvenile court's suggestion that Child was frightened and afraid of Mother. *See id.* at 19-20.  Mother also contests the court's indication that reunification would not actually be a reunification with Mother.  *See id.* at 20-21.  As such, Mother asserts:

> There is no dispute that Mother was available, capable and willing to provide care to [Child].  She had stable housing, employment and was available immediately to take custody of [Child].  Further, no clear and convincing evidence was presented to suggest otherwise.  Therefore, [Child] does not meet the statutory definition of a dependent child, and the lower court erred in adjudging her dependent.

*Id.* at 21.

Instantly, the record supports the juvenile court's adjudication of dependency, and we discern no abuse of discretion.  Mother testified that she is "ready and willing and able" for Child to return to her home.  *See* N.T. at 56.  Mother indicated stable employment and housing with a room available for Child.[14]  *Id.* at 37-38, 40-41, 56.  However, she admitted to having an alcohol problem since 2017 for which she was ultimately incarcerated as a result of a third DUI in 2019.  *Id.* at 44-46.  While engaged in outpatient treatment, Mother suffered a relapse in February 2022 and was subsequently

---

[14] At the time of the hearing, Mother testified that she lived with a male friend who permits her to stay at his six-bedroom house as his "caregiver."  N.T. at 40, 56.  Mother indicated that there was "a room waiting for" Child.  *See id.* at 56.

discharged due to inability to make appointments.[15]   *Id.* at 51-52, 59. Moreover, Mother failed to exercise her custodial rights for almost three years and had infrequent contact with Child.[16]   *Id.* at 8, 48-49, 58 (explaining her contact with Child "was not that frequent because [Child] had color guard, and she was with friends, and stuff . . . so she was very rarely home during the times that [Mother] would be able to reach her, which is evening hours.").

Agency caseworker, Cuevas-Rios, testified in support of the Agency's request for an adjudication of dependency.  She explained:

> I'm saying the child should be dependent because there are some concerns.  She doesn't have a relationship with [Mother], and [Mother] had her prior to the alcohol addiction problem, but the child stated last time she spoke to her in December she continued having that addiction problem and that [Mother] gets aggressive. Other concerns were brought in when I spoke with the other sibling.

*Id.* at 30.  As such, as we discern no abuse of discretion, we do not disturb the adjudication of dependency.

---

[15] Mother indicated that she had not been to treatment for approximately three weeks, noting issues with transportation expenses.  *See* N.T. at 52, 59. Mother confirmed that outpatient treatment was a requirement of her probation.  She testified to commencing a new program the following week and that probation officials were aware of the brief break in treatment.  *Id.* at 51-52, 60.

[16] Mother testified to a discussion in February 2022 with Child returning home. *See* N.T. at 39-40.  Child testified that she last talked to Mother "within the last year" and Mother cried.  *Id.* at 8.  The caseworker, however, testified that Mother's last contact with Child was in December of 2021.  *See* N.T. at 30.

Next, we turn to Mother's challenge of the permanency goal. In so doing, our standard of review is the same abuse of discretion standard as noted above. **See In the Interest of L.Z.**, 111 A.3d at 1174 (citing **In re R.J.T.**, 9 A.3d at 1190, for the proposition that the abuse of discretion standard applies in a dependency matter); **see also In re S.B.**, 943 A.2d 973, 982 (Pa. Super. 2008) ("Initially, our standard of review of an order regarding a placement goal of a dependent child is the abuse of discretion standard.") (citation omitted).

Mother argues that the juvenile court erred in establishing a permanency goal of SPLC with a concurrent goal of adoption, highlighting a lack of aggravated circumstances and the Juvenile Act's objective of family unity.[17] **See** Mother's Brief at 25-27. Mother states:

> Petitions can be filed, and goals can be changed during the life of a dependency case, but none of that negates the lower court's abuse of discretion in this case by establishing an initial goal of anything other than reunification absent a finding of aggravated circumstances. . . . Any initial goal other than reunification, except in rare circumstances, flies directly in the face of the Juvenile Act's purpose of promoting family unity.

**Id.** at 27.

In support of its established permanency goal of SPLC, the juvenile court indicated that "remaining in the foster care placement is best suited to

---

[17] With her argument Mother addresses two recent unpublished memoranda, **In the Interest of K.C.**, 268 A.3d 438 (Pa. Super. 2021) (unpublished memorandum) and **In the Interest of G.E.**, 284 A.3d 946 (Pa. Super. 2022) (unpublished memorandum), which we address within. **See** Mother's Brief at 24-25.

[Child]'s safety, and her well-being." Juvenile Ct. Op., 10/17/22, at 18. The court stated, "At [15] years of age, [Child] is able to be consulted about her permanency plan. The [c]ourt found [Child] to be a mature teenager, well-capable of communicating her desired permanency placement to the court. The [c]ourt has interviewed [Child *in camera*], and [Child] indicated she wishes to remain with the foster parents." *Id.* The court noted its focus and concern for Child's state of mind and mental well-being. *Id.* at 20. Further, addressing Child's desire for stability, the court then recounted Mother's enduring substance abuse, lack of exercise of custodial rights for an extended period of time, and lack of communication. *Id.* As such, despite its support of reunification, as reflected by its order related to ICPC and therapeutic visitation, the court found neither reunification nor adoption appropriate goals.[18] *Id.* at 21. Rather, the court determined that remaining in her foster care placement was in Child's best interest because it will provide her stability with respect to school, friends, activities, and employment. *Id.* The court concluded:

> Child has essentially been independent of Mother for around five years and has not seen biological father for twelve years. At Child's age of fifteen, adoption may be difficult, and Child has not expressed a desire to be adopted. Given [Child]'s state of mind

---

[18] While the court suggests that a reunification with Mother would not actually be a reunification with Mother, as Mother would instead permit Child to reside with another relative, *see* Juvenile Ct. Op. at 21, we believe the court misconstrues Mother's testimony, *see* N.T. at 48, 58 (Mother testifying that her plan at the time she was incarcerated was to have Child stay with a friend, but subsequently stating that she believed Child was family).

and her clear desire to remain where she is safe and feels supported, the [c]ourt stands by its adjudication of dependency and its primary goal of subsidized permanent legal custody.

*Id.* at 21-22 (record citation omitted).

Section 6351 of the Juvenile Act controls the disposition of dependent children. Preliminarily, a stated purpose of the Juvenile Act is "to **preserve the unity of the family** whenever possible. . . ." 42 Pa.C.S. § 6301(b)(1) (emphasis added).[19] Given this focus on reunification, "child welfare agencies are required to make reasonable efforts to return a foster child to his or her biological parent. When those efforts fail, the agency 'must redirect its efforts toward placing the child in an adoptive home.'"[20] **In the Interest of A.W.**,

---

[19] We have also acknowledged the spirit of reunification rooted in the federal Adoption and Safe Families Act (ASFA), 42 U.S.C. § 671 *et seq.*, to which the Juvenile Act was amended in 1998 to conform. **See A.W.**, 162 A.3d 1120 (Pa. Super. 2017), citing **In re M.S.**, 980 A.2d 612, 615 (Pa. Super. 2009).

[20] Notwithstanding, "all family reunification may cease in the presence of a finding of aggravated circumstances." **M.S.**, 980 A.2d at 615. **See** 42 Pa.C.S. § 6341(c.1); **see also** 42 Pa.C.S. § 6351(b)(2). "Aggravated circumstances" have been defined as:

"**Aggravated circumstances.**" Any of the following circumstances:

(1) The child is in the custody of a county agency and either:

(i) the identity or whereabouts of the parents is unknown and cannot be ascertained and the parent does not claim the child within three months of the date the child was taken into custody; or

*(Footnote Continued Next Page)*

---

(ii) the identity or whereabouts of the parents is known and the parents have failed to maintain substantial and continuing contact with the child for a period of six months.

(2) The child or another child of the parent has been the victim of physical abuse resulting in serious bodily injury, sexual violence or aggravated physical neglect by the parent.

(3) The parent of the child has been convicted of any of the following offenses where the victim was a child:

(i) criminal homicide under 18 Pa.C.S. Ch. 25 (relating to criminal homicide);

(ii) a felony under 18 Pa.C.S. § 2702 (relating to aggravated assault), 3121 (relating to rape), 3122.1 (relating to statutory sexual assault), 3123 (relating to involuntary deviate sexual intercourse), 3124.1 (relating to sexual assault) or 3125 (relating to aggravated indecent assault).

(iii) A misdemeanor under 18 Pa.C.S. § 3126 (relating to indecent assault).

(iv) An equivalent crime in another jurisdiction.

(4) The attempt, solicitation or conspiracy to commit any of the offenses set forth in paragraph (3).

(5) The parental rights of the parent have been involuntarily terminated with respect to a child of the parent.

(6) The parent of the child is required to register as a sexual offender under Subchapter H of Chapter 97 (relating to registration of sexual offenders)[1] or to register with a sexual offender registry in another jurisdiction or foreign country.

42 Pa.C.S. § 6302.  Here, there was no finding of allegation of aggravated circumstances.

162 A.3d at 1120 (internal citations omitted); *see also In re D.C.D.*, 105 A.3d 662, 675 (Pa. 2014) (recognizing agencies are required to make reasonable efforts to allow parents the opportunity to "work toward reunification with their dependent children[.]").

With respect to disposition of a dependent child, we have stated:

The trial court must focus on the child and determine the goal with reference to the child's best interests, not those of the parents. [42 Pa.C.S. § 6351(f)]. "Safety, permanency, and well-being of the child must take precedence over **all** other considerations." [*In re N.C.,* 909 A.2d 818, 823 (Pa. Super. 2006)].

*In re S.B.*, 943 A.2d at 978; *see also In the Interest of A.W.*, 162 A.3d 1117, 1121 (Pa. Super. 2017); *see also* 42 Pa.C.S. § 6351. Along with reunification and adoption, the court may decide to place the child with a legal custodian or a fit and willing relative if reunification and adoption are not in the child's best interests. *See* 42 Pa.C.S. § 6351(f.1)(1)-(4).

This option of placement with a permanent legal custodian has been explained by this Court as

an arrangement whereby a juvenile court discontinues court intervention as well as supervision by a county agency, and awards custody of a dependent child, on a permanent basis, to a custodian. Parental rights are not terminated. The custodian is typically provided a financial subsidy for the child by the local county children and youth agency. The subsidy component is generally an integral component when permanent legal custody is considered a viable option.

*In re S.H.*, 71 A.3d 973, 978 (Pa. Super. 2013) (internal citation & footnote omitted); *see also* 42 Pa.C.S. § 6351(a)(2.1) ("Subject to conditions and limitations as the court prescribes, transfer permanent legal custody to an

individual resident in or outside this Commonwealth, including any relative, who, after study by the probation officer or other person or agency designated by the court, is found by the court to be qualified to receive and care for the child. A court order under this paragraph may set forth the temporary visitation rights of the parents. The court shall refer issues related to support and continuing visitation by the parent to the section of the court of common pleas that regularly determines support and visitation."). While the use of the term permanent ends court supervision, "[t]his language does not confer or divest parents of any substantive rights but rather addresses the proper venue for visitation and support matters following the grant of a permanent legal custody arrangement." *S.H.*, 71 A.3d at 978-79.

In *In the Interest of L.T.*, 158 A.3d 1266, 1282 (Pa. Super. 2017), this Court concluded that the juvenile court abused its discretion in changing the child's permanency goal from reunification to adoption after only approximately two months of services. In so holding, we distinguished other cases involving long-standing agency involvement and aggravated circumstances, as well as indifference toward corrective measures. *See id.* at 1279-80. In reversing the goal change order, we stated: "Plainly, this is not a case where it is obvious that an uninterested parent is wasting reunification resources while a child languishes in foster care. Mother made some progress during the brief period of reunification, and it is in L.T.'s best interest to grant Mother a legitimate opportunity to demonstrate that reunification is viable." *Id.* at 1283.

Further, in **In the Interest of K.C.**, 268 A.3d 438 (Pa. Super. 2021) (unpublished memorandum) at *2,[21] this Court affirmed an adjudication of dependency and reversed the juvenile court's *sua sponte* change of the child's concurrent permanency goal from reunification to SPLC. The court noted that reunification was a "fantasy," after only three weeks and where the father had been engaging in services. **Id.** at *5-6. As such, the father challenged the court's goal change as "premature." **Id.** at *5. He pointed to the brief time since the adjudication of dependency and the absence of aggravated circumstances. Given the lack of aggravated circumstances, he further suggested a conflict with the Juvenile Act's aim of family unity. **Id.** This Court agreed with the father and concluded that the juvenile court abused its discretion, stating:

> Upon review, we are constrained to conclude that the evidence does not sustain the juvenile court's decision to terminate reunification efforts and change Child's concurrent permanency goal. It is undisputed that Father had been receiving services for

---

[21] Pursuant to this Court's Internal Operating Procedures, this unreported memorandum is cited as applicable, persuasive authority due to limited precedent on the issue. **See** Superior Court Internal Operating Procedure (IOP) § 65.37(B) (stating, "Non-precedential decisions filed after May 1, 2019, may be cited for their persuasive value, pursuant to Pa.R.A.P. 126(b). An unpublished memorandum decision filed prior to May 2, 2019, shall not be relied upon or cited by a Court or a party in any other action or proceeding. . . ."). By way of definition, "For purposes of these operating procedures, 'non-precedential decision' refers to an unpublished, non-precedential, memorandum decision of the Superior Court filed after May 1, 2019. All references to a memorandum decision filed after May 1, 2019, within these operating procedures shall be analogous to 'non-precedential decision' for purposes of Pa.R.A.P. 126(b)." Superior Court IOP § 65.37(B).

– at most – 22 days, and acted affirmatively by getting alcohol screens, attending supervised visits with Child, and completing intake with Pressley Ridge family services.

Moreover, the juvenile court did not address Child's best interests. "Pennsylvania's Juvenile Act focuses upon reunification of the family, which means that the unity of the family shall be preserved 'whenever possible.'" [**A.W.**, 162 A.3d at 1120] (citing **In re M.S.**, 980 A.2d 612, 615 (Pa. Super. 2009)). This Court has opined:

> Assisting parents with achieving the Juvenile Act's goal of family unity in a timely fashion ultimately benefits children, as it will result either in a successful safe reunification or a clearer picture of the parents' inability to remedy the conditions causing the child to be out of their care, requiring movement towards an alternate permanency goal.

**In re C.K.**, 165 A.3d [935, 944 (Pa. Super. 2017)].

**K.C.**, 268 A.3d 438, at *6.

Turning to the present matter, the record supports the court's continued placement of Child with her foster parents. Moreover, Mother did not oppose Child's placement with her foster parents. However, we agree with Mother that the court's establishment of a placement goal of SPLC with a concurrent goal of adoption was premature and contravenes the purpose of the Juvenile Act of family unity and reunification, particularly as there was no finding of aggravated circumstances. **See K.C.**, 268 A.3d 438, at *6-7; **see also A.W.**, 162 A.3d at 1120; **see also M.S.**, 980 A.2d at 615.

We point out that although the court ordered therapeutic supervised visitation as well as an ICPC, without a goal of reunification, the Agency is not required to provide reasonable efforts and further assistance to Mother. We also recognize that a goal of reunification would provide clarity as to Mother's

situation and ability to successfully reunify with Child. *See C.K.*, 165 A.3d at 944. Notably, Cuevas-Rios testified to limited investigation and information[22] regarding Mother and noted limited contact with Mother. *See* N.T. at 26-27. Cuevas-Rios recounted that she had only obtained information regarding Mother's employment, housing, and probation. *Id.* at 26-27. She had not spoken with Mother's probation officer. *Id.* at 27. She had no verification as to Mother's probation or substance abuse treatment or testing. *Id.* at 29. While stating that Child reported that Mother was "continuing drinking" and becomes "aggressive," Cuevas-Rios admitted that she and Child "didn't go into details." *Id.* at 31-32.

Notwithstanding its stated consideration of Child's state of mind and well-being above preference, the court acknowledged *In the Interest of G.E.*, 284 A.3d 946 (Pa. Super. 2022) (unpublished memorandum). *See* Juvenile Ct. Op. at 20. In *G.E.*, this Court affirmed a disposition of permanent legal custody with respect to a 14-year-old child, consistent with the child's preference. *G.E.*, 284 A.3d at *1. Specifically, subsequent to reports of sexual abuse, the child was removed from his father and placed with kinship parents. *Id.* Thereafter, the court adjudicated the child dependent and established an initial permanency goal of reunification with a concurrent goal of permanent legal custody. *Id.* Approximately five months later, the court

_____

[22] We reiterate that the period between the July 27, 2022, order granting emergency protective custody, and the August 23, 2022, adjudicatory hearing was approximately four weeks.

changed the concurrent goal to adoption. *Id.* Then, one month later, the court held a dispositional hearing. The child's guardian *ad litem* argued that the child wanted to stay with the kinship parents and asserted that this would maintain stability. Despite finding that the mother had obtained stable housing and sustained consistent visitation, the court awarded the child's mother and kinship parents shared legal custody, kinship parents primary physical custody, and the mother partial physical custody. The court further terminated the adjudication of dependency and court supervision. *Id.* at *2. This Court affirmed the court's disposition, in effect, permanent legal custody, as the court found such disposition to be in the child's best interest. *Id.* at *5.

Mother argues that *G.E.* is distinguishable as the court established the initial permanency goal as reunification and did not enter its dispositional order until the child had been in care for almost six months. *See* Mother's Brief at 24-25. We agree. As such, we conclude the court abused its discretion in establishing a goal of SPLC with a concurrent goal of adoption.

For the foregoing reasons, we affirm the order adjudicating Child dependent. We vacate the portion of the order establishing a permanency goal of SPLC with a concurrent goal of adoption and remand to the juvenile court to file a new order establishing reunification as Child's permanency goal.

Order affirmed in part and vacated in part. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>05/15/2023</u>