**In the Matter of S.J.–L., a Minor.**

**Appeal of N.J.–L.**

Superior Court of Pennsylvania.

Submitted Feb. 11, 2003.
Filed April 29, 2003.

Royce L. Morris, Harrisburg, for appellant.

Lawrence J. Rosen, Harrisburg, Guardian Ad Litem.

Jason Kutulakis, Carlisle, for Dauphin County Children & Youth.

Before: JOHNSON, JOYCE and OLSZEWSKI, JJ.

JOYCE, J.:

¶ 1 N.J.-L. (Appellant) appeals from the order dated April 15, 2002, in the Dauphin County Court of Common Pleas that declared S.J.-L. to no longer be dependent as defined by 42 Pa.C.S.A. § 6302 and released S.J.-L. from the custody of Dauphin County Social Services for Children and Youth to the custody of her natural father, F.C. We affirm. The relevant facts and procedural history of this child dependency matter are set forth below.

¶ 2 S.J.-L. was born January 23, 1990. Prior to Dauphin County Children and Youth Services' intervention, she resided with Appellant and Appellant's husband,

L.J.-L., in addition to her two siblings in Harrisburg, Pennsylvania. On February 9, 2001, Children and Youth Services was contacted by officials at S.J.-L.'s school concerning abuse S.J.-L. claimed she suffered at the hands of L.J.-L. On that day, February 9, 2001, S.J.-L., whose eye was swollen shut, told school officials that L.J.-L. had hit her. Additionally, S.J.-L. told Youth Services that L.J.-L. withheld food and water from her, and he beat her regularly with a belt, a cord, and his fists, in addition to making her sleep on the basement floor naked and bound with tape. S.J.-L. also disclosed that L.J.-L. did not beat her siblings. Finally, S.J.-L. told Children and Youth Services that L.J.-L. threatened to kill her if she told anyone about the abuse. A physical examination of S.J.-L. conducted February 9, 2001, revealed lacerations and other injuries of varying age to her head, back, buttock, feet, toes, in addition to healed burn marks on her back.

¶ 3 S.J.-L. was removed from the home and placed in protective custody that same day. Later, Appellant and L.J.-L. contacted Youth Services to discuss the allegations. During this discussion, L.J.-L. admitted beating S.J.-L. with a belt, but denied that the injuries on the child's body were caused by his actions. L.J.-L. explained that S.J.-L. caused these injuries to herself, or that they were as a result of abuse she suffered at the hands of her uncles in Haiti prior to moving to the United States.[2] Appellant and L.J.-L. also admitted that S.J.-L. was isolated from the rest of the family and forced to sleep in the basement, but explained that the basement is finished and that they never bound S.J.-L. with tape or made her sleep naked.

¶ 4 On March 7, 2001, S.J.-L. was adjudicated dependent and placed in the custody of Children and Youth Services. Appellant did not appeal this order.

¶ 5 Children and Youth Services determined that a goal of family reunification was proper, but this goal was abandoned due to Appellant and L.J.-L.'s non-compliance with Children and Youth Services' objectives.[3] While in foster care more information about the family came to light. Children and Youth Services discovered that L.J.-L. was not S.J.-L.'s father. S.J.-L. informed Children and Youth Services that her "real" father was named F.C. and he lived in Florida. This allegation was confirmed through blood testing. Appellant initially stated that she did not know of anyone named F.C., but after blood testing confirmed paternity, Appellant alleged that she became pregnant after F.C. raped her.[4] Appellant produced a Haitian birth certificate naming L.J.-L. as the father, but F.C. provided a Haitian birth certificate naming him as S.J.-L.'s father. Additionally, F.C. had several older photographs of S.J.-L. and also had copies of receipts from sending money to Appellant for S.J.-L.'s support. The children and Youth Services' caseworker noted that S.J.-L was excited to see F.C. and it was obvious that they had prior contact. The caseworker further stated that F.C. gave a credible history of S.J.-L., Appellant, and L.J.-L.

¶ 6 F.C. informed Children and Youth Services that he was ready, willing, and

---

2. S.J.-L. and her two siblings came to the United States in 2000 to join Appellant and L.J.-L. who moved here in 1994.

3. Children and Youth Services defined Appellant and L.J.-L. as non-compliant due to their refusal to sign releases or a treatment plan,

and due to Appellant visiting S.J.-L. at school without permission.

4. Nothing in the record supports the allegation of rape.

able to take custody of S.J.-L. At a review hearing on July 19, 2001, Children and Youth Services recommended that S.J.-L. be placed with her biological father, F.C.

¶ 7 Following the July 19, 2001 hearing, the Honorable Todd Hoover, adopted Children and Youth Services' recommendation and ordered S.J.-L. to remain dependent but be placed with F.C. in Florida under supervision of Children and Youth Services and the Florida Department of Children and Families. It appears from the record that S.J.-L. has remained in Florida with F.C. since this time. Appellant did not appeal this order.

¶ 8 On January 8, 2002, another review hearing was held before Judge Hoover. Children and Youth Services recommended that S.J.-L. be declared no longer dependent and be released to the custody of F.C. However, the Juvenile Master did not follow the recommendation because the Florida Department of Children and Families had not yet provided the reports on how S.J.-L. was faring. Judge Hoover ordered that S.J.-L. remain dependent but in the care of F.C. in Florida. Appellant did not appeal this order.

¶ 9 On March 12, 2002, Children and Youth Services informed Judge Hoover that the Florida Department of Children and Families had conducted its home study and concluded that F.C. and his wife have been excellent caretakers for S.J.-L. and in fact recommended that S.J.-L., F.C., and his wife no longer needed the services of that department. Additionally, Dauphin County Children and Youth Services believed that it was appropriate to release S.J.-L. to the custody of F.C. and declare her no longer dependent.[5]

¶ 10 In consideration of the above information, Judge Hoover declared that S.J.-L. was no longer dependent in an order filed April 15, 2002. The order released S.J.-L. from the custody of Children and Youth Services and placed her in the custody of her father in Florida. On May 10, 2002, Appellant filed a notice of appeal.

¶ 11 On appeal, Appellant raises one issue: "[w]hether the trial [sic] erred in terminating dependency without a hearing where the natural father had only recently been identified and no reunification services were provided to [Appellant], who prior to the agency intervention was the physical custodian of [S.J.-L.]?" Brief for Appellant, at 4.

¶ 12 We will begin by setting forth the definition of a dependent child. Under Pennsylvania law, a dependent child is a child who:

is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk, including evidence of the parent's, guardian's or other custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk[.]

42 Pa.C.S.A. § 6302.

¶ 13 Furthermore, if the trial court determines that there is clear and convincing evidence that a child is dependent pursuant to the definition above, the trial court may make an appropriate disposition to

---

5. The record reflects that Appellant was given a copy of this letter, and Appellant does not dispute this fact.

protect the child. *See* 42 Pa.C.S.A. § 6341(a) and (c). Such a disposition includes removing the dependent child from the home and transferring custody of that child to any individual or agency found by the court to be qualified to receive and care for the child. *See* 42 Pa.C.S.A. § 6351(a).

¶ 14 In dependency proceedings our standard of review is broad. *In Re C.J.*, 729 A.2d 89 (Pa.Super.1999). Nevertheless, we will accept those factual findings of the trial court that are supported by the record because the trial judge is in the best position to observe the witnesses and evaluate their credibility. *Id.* We accord great weight to the trial judge's credibility determinations. *Id.* "Although bound by the facts, we are not bound by the trial court's inferences, deductions, and conclusions therefrom; we must exercise our independent judgment in reviewing the court's determination, as opposed to its findings of fact, and must order whatever right and justice dictate." *Id.* at 92.

¶ 15 Here, the record reflects that Appellant was unwilling, unready, and unable to provide S.J.-L. with proper parental care and control. Appellant admitted that L.J.-L. beat S.J.-L., admitted that S.J.-L. was isolated from the rest of the family, and that she did nothing to prevent it. N.T. Review Hearing, July 19, 2001, at 87, 94. Additionally, Appellant admitted that she would not cooperate with Children and Youth Services if she did not like their recommendation. *Id.* at 84.

¶ 16 Appellant argues that she was denied due process when the trial court terminated the dependent status of S.J.-L. without a hearing. We disagree.

¶ 17 Appellant was notified of Children and Youth Services' desire to terminate dependency prior to the January 8, 2002 review hearing. She was again notified of Children and Youth Services' intention to seek termination of dependency and the Florida Department of Children and Families' agreement on this issue in the March 12, 2002 recommendation to the trial court. Appellant points to no authority that mandates a hearing be held before a juvenile court may release a child from dependency.

¶ 18 Moreover, we find that because F.C. was ready, willing, and able to provide parental care and control, S.J.-L. by statutory definition was no longer dependent.

> [I]t is the duty of the trial court to determine whether the non-custodial parent is capable and willing to render proper parental control prior to adjudicating a child dependent. If the court determines that the custodial parent is unable to provide proper parental care and control "at this moment" and that the non-custodial parent is "immediately available" to provide such care, **the child is not dependent under the provisions of the Juvenile Act.** Consequently, the court must grant custody of the allegedly dependent child to the non-custodial parent. Once custody is granted to the non-custodial parent, "the care, protection, and wholesome mental and physical development of the child" can occur in a family environment as the purpose of the Juvenile Act directs. 42 Pa.C.S. § 6301(b).

*In Re M.L.*, 562 Pa. 646, 650, 757 A.2d 849, 851 (2000), quoting *In the Interest of Justin S.*, 375 Pa.Super. 88, 543 A.2d 1192, 1200 (1988) (emphasis supplied).

¶ 19 We find no abuse of discretion in the trial court's decision not to hold a hearing since the record reflects that S.J.-L. was by definition not dependent. Furthermore, Appellant's due process argument lacks merit because she knew of the permanency plan for months, was notified

of Children and Youth Services' intention to seek termination of dependency, and did not take any action to challenge the trial court's prior orders despite the fact that she could have requested a hearing. *See* 42 Pa.C.S.A. § 6305(d). Appellant failed to take any action until S.J.-L. was ruled to be no longer dependent.

¶ 20 Since the record illustrates that F.C. was immediately ready, willing, and able to provide parental care and control, and because the trial court credited Children and Youth Services' assertion that F.C. was a suitable guardian, we find no error in the trial court's decision. Accordingly, the order terminating dependency and placing S.J.-L. with F.C. is affirmed.

¶ 21 Order affirmed.