J-A04041-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.I., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: A.J.I., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1282 MDA 2024 |

Appeal from the Order Entered July 30, 2024
In the Court of Common Pleas of Centre County
Juvenile Division at No(s): CP-14-DP-0000022-2024

BEFORE: LAZARUS, P.J., NICHOLS, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.:                    **FILED: MARCH 21, 2025**

A.J.I. ("Mother") files this appeal from the July 30, 2024, order adjudicating her thirteen-year-old son, A.I. ("the Child"), dependent pursuant to the Juvenile Act.[1]  After review, we affirm.[2]

The juvenile court aptly set forth the relevant facts and procedural history of this case, as follows:

> Centre County Children and Youth Services ("CYS" [or the "Agency"]) has been involved with Mother and the Child since April 22, 2013, when the [A]gency became involved due to court[-]ordered facilitation of visits between the Child and [Father].  On February 28, 2024, CYS received a referral relaying concerns of an alleged meth[amphetamine] lab[oratory] at the residence of Child's maternal grandmother[] ("Maternal Grandmother"), where Mother resides with the Child.  A CYS caseworker, accompanied by a Pennsylvania State Police

_____

[1] **See** 42 Pa.C.S.A. §§ 6302- 6387.

[2] Child's father, J.T.R. ("Father," collectively with Mother, "Parents"), did not file an appeal and did not participate in the instant appeal.

[t]rooper, immediately went to the residence in question. The caseworker met with Mother, who acknowledged that she, the Child, her sister . . . and her nephew [] were living at the residence with Maternal Grandmother. Mother refused the caseworker access to the home, stating that Maternal Grandmother was not [at] home, and as such, they needed the landlord's approval to allow the caseworker inside.

The CYS caseworker subsequently met with the Child during a school visit, and the Child denied that there were any issues at home. However, the Child stated that he did not know who his father was, did not know his father's name, and never recalled meeting him. The caseworker noted that the Child had numerous blackened teeth. The caseworker also attempted to meet with [Mother's] nephew at that time but was unable to do so. After the school visit, the caseworker returned to Maternal Grandmother's residence and met with [Mother's sister ("Maternal Aunt")],[3] Maternal Grandmother, and Mother outside the residence. The caseworker asked permission to enter the residence and asked the three women to submit to a drug test, but both requests were refused. At this time, CYS implemented a safety plan. A subsequent safety plan was put into place on March 1, 2024.

CYS then received a new referral on March 7, 2024, expressing concerns regarding the Child's teeth being black and that Mother was allegedly under the influence while with the Child at Mount Nittany Medical Center, where the Child was being seen for a significant fever. On March 27, 2024, CYS conducted a home visit at Maternal Grandmother's residence, where she, Maternal Aunt, and Mother allowed CYS to enter the residence. All three family members submitted to a drug test and all three tested positive for marijuana use.

On March 28, 2024, a CYS caseworker met with the Child during another school visit. The Child stated that he had never been seen by the dentist and had expressed concerns regarding chronic fatigue. The Child reported that he had been seen by a doctor . . . for his chronic fatigue and that it was due to a liver

_____

[3] Maternal Aunt's son lived in the subject home, but Maternal Aunt lived elsewhere. *See* N.T., 7/29/24, at 8. It is not clear from the certified record if she ultimately became a resident of the subject home during the dependency proceedings.

issue, but that no follow-up appointments were made. A caseworker then conducted another home visit on April 18, 2024, and again met with all three family members. All three family members voluntarily consented to a drug test, but stated it was the last time they would agree to one. All three caregivers again tested positive for marijuana. CYS spoke with Mother and addressed its concerns regarding the Child's dental issues. Mother stated that the Child had been to the dentist several times and that she would schedule another dentist appointment for the Child. She also signed a release allowing CYS access to the Child's records at University Dental Care.

On April 26, 2024, a CYS caseworker met with the Child during another school visit. The Child presented as exhausted, with dark circles under his eyes. The Child stated he was very tired and that he thought this was due to liver issues. The Child said he had been tested for liver issues previously, and that he was to take a medication, but never received it. On that day, CYS opened the Child's family [sic] for protective services. On May 14, 2024, a caseworker spoke with a representative of University Dental Care and learned that the Child had never been seen there. On May 22, 2024, a caseworker again met with the Child during a school visit. The Child stated that he was extremely tired and that Mother had not yet scheduled a doctor's appointment for him.[4]

On June 5, 2024, a CYS caseworker met with Mother and informed her that University Dental Care had no record of the Child. Mother was unable to identify any additional dental providers. Additionally, she stated that a doctor's appointment had not yet been arranged for the Child. Mother subsequently signed a medical records release for Mount Nittany - Penns Valley Medical. The caseworker asked Mother to submit to a drug test at that time, but she refused. CYS ultimately learned that the Child had previously been seen at Mount Nittany - Penns Valley, but not since 2023,[5] when the Child had been seen and recommended to consult an eye doctor and dentist.

---

[4] A subsequent telephone call to Mother revealed her number had been disconnected. See N.T., 7/29/24, at 13.

[5] There was additionally an indication of malnutrition. **See** N.T., 7/29/24, at 14.

On June 20, 2024, a CYS caseworker met with Mother and Maternal Grandmother during another home visit. Mother indicated that the Child would have never been seen at Mount Nittany - Penns Valley, because he goes to Geisinger - Scenery Park. Mother then signed a medical records release[, effective for one week at her request,] for Geisinger - Scenery Park.

Juvenile Court Opinion, 10/14/24, at 1-4.

The Agency filed a dependency petition on June 27, 2024, based upon a lack of proper parental care and control pursuant to 42 Pa.C.S.A. § 6302(1) ("Dependent child"). The court held an adjudicatory hearing on July 29, 2024. Mother was present and represented by counsel. Father, while not present, was also represented by counsel. The Child was represented by a guardian *ad litem*.[6]

At the hearing, the Agency presented the testimony of its caseworker, Cassandra Clark ("Ms. Clark"). Ms. Clark testified to observing that the Child's teeth were "blackish toward the roots" when she visited him at school following the February 2024 referral,[7] and that the Child told her he was excessively tired. *See* N.T., 7/29/24, at 7, 10.[8] Ms. Clark testified the Child told her in March 2024, that he had never been to a dentist. *See id*. at 10.

---

[6] The Child's guardian *ad litem* filed a brief in support of adjudication with this Court.

[7] The court, which previously interviewed the Child, had noted the Child's teeth were "dark." *See* N.T., 7/29/24, at 57-58.

[8] Ms. Clark testified all adult caregivers tested positive for marijuana during March 2024, and April 2024, home visits, and that none of them had a medical marijuana card. *See* N.T., 7/29/24, at 10, 12.

Ms. Clark testified that Mother said the Child had been seen at University Dental Care, but when she checked, that practice had no record of the Child as a patient. ***See id***. at 10, 12-13, 15.

Ms. Clark testified the Child repeatedly complained about fatigue and had dark circles under his eyes. ***See id***. at 11-12. She testified that the Child was still extremely tired at a May 2024 school visit and that Mother had not scheduled a doctor's visit, although the Child said he had repeatedly asked her to do so. ***See id***. at 10-14. Ms. Clark testified that during a home visit later that month, Mother was confused about why the Child would need a medical appointment. ***See id***. at 13-14.

Ms. Clark testified she confirmed through medical records that the Child had not been to the doctor since 2023, at which time the provider had noted malnourishment and recommended the Child see an eye doctor and a dentist. ***See id***. at 14. Ms. Clark testified she received medical records from Geisinger - Scenery Park, the Child's provider at the time of the subject hearing, that he was diagnosed with Lyme disease as a toddler, information Mother had not given to the Agency. ***See id.*** at 16. Ms. Clark testified that although Mother had placed the Child on a waitlist for a dental appointment at the time of the subject hearing, she had not taken the Child to the dentist in the four preceding years. ***See id***. at 15-16. Ms. Clark testified that Mother refused to consent to an in-home dependency order to allow the Agency to monitor concerns for substance abuse, home conditions, and the Child's health

although the Agency had the more severe option of seeking custody of the Child to protect his welfare. ***See id***. at 17. By the time of the hearing, Mother had taken the Child to the doctor and scheduled a dentist's appointment. ***See id***. at 22-23, 27-28.

Mother testified at the hearing that the Child had been at the dentist "three or four years ago . . . give or take," and "hasn't really needed dental appointments. He hasn't had any cavities until recently." ***Id***. at 32, 36-39. Mother testified that she saw no need to take him more frequently because she "could see his teeth" and did not see any issues. ***See id***. at 39-40, 47. Mother admitted she did not have a medical marijuana card and blamed her use of the drug on her need "[t]o relieve stress caused by you people." ***Id***. at 40-46.

After hearing the evidence and arguments, by order of adjudication and disposition dated July 29, 2024, and entered July 30, 2024, the juvenile court adjudicated Child dependent.[9] Significantly, the court found that the Agency is "unable to assure the safety and well-being of [the Child] in the care and custody of [Mother] . . . without the Agency's ability to address the substance

---

[9] The Agency did not seek removal of Child, and the juvenile court maintained Child's custody and placement. ***See*** N.T., 7/29/24, at 56; Order of Adjudication and Disposition, 7/30/24, at 1. The court further ordered Parents to "cooperate fully" with the Agency as it relates to drug testing, home inspections, and the signing of releases. Order of Adjudication and Disposition, 7/30/24, at 2.

use concerns, [the Child's] health, and the condition of the residence, with full cooperation from [Mother] . . ..'" Order of Adjudication and Disposition, 7/30/24, Findings of Fact, at ¶ 17. Thereafter, Mother filed a timely notice of appeal.[10] On October 14, 2024, the court filed a responsive Rule 1925(a) opinion.

On appeal, Mother raises the following issues for our review:

I. Whether the [juvenile court] erred when finding the [C]hild dependent when there was an absence of clear and convincing admissible evidence that the [C]hild was without proper parental care when at the time of the hearing, such care was immediately available with Mother who had done everything requested of her by CYS[?]

II. Whether the [juvenile court] erred by finding dependency based upon Mother's handling of "conditions" that were never proven by CYS through competent or admissible medical/dental witness when the alleged medical concern was disproven as untrue and the second concern over dental appointments was remedied by Mother before the time of the hearing[?]

Mother's Brief at 4.

Our standard of review for dependency cases is as follows:

[T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record[] but does not require the appellate court to accept the

---

[10] Mother failed to file a contemporaneous concise statement of errors complained of on appeal in violation of Pa.R.A.P. 1925(a)(2)(i) and (b). The juvenile court entered an order directing the filing of a Rule 1925(b) statement. Mother subsequently complied. Because there is no claim of prejudice because of Mother's procedural violation, we do not quash or dismiss Mother's appeal. **See In re K.T.E.L.**, 983 A.2d 745, 748 (Pa. Super. 2009) (stating that although the failure to file a 1925(b) statement concomitantly with a children's fast track appeal renders the notice of appeal defective, the Court will not quash the appeal absent prejudice).

> lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010) (citations omitted); *see also In the Interest of L.Z.*, 111 A.3d 1164, 1174 (Pa. 2015). This Court has recognized the deference due trial court on questions of fact:

> In dependency proceedings our standard of review is broad. Nevertheless, we will accept those factual findings of the trial court that are supported by the record because the trial judge is in the best position to observe the witnesses and evaluate their credibility. We accord great weight to the trial judge's credibility determinations.

*In re S.J.-L.*, 828 A.2d 352, 355 (Pa. Super. 2003) (internal citations and quotations omitted).

To adjudicate a child dependent, a trial court must determine by clear and convincing evidence, that the child:

> is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk, including evidence of the parent's . . . use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk[.]

42 Pa.C.S.A. § 6302(1) ("Dependent child"). "Clear and convincing" evidence has been defined as testimony that is "so clear, direct, weighty, and convincing as to enable the trier of facts to come to a clear conviction, without

hesitancy, of the truth of the precise facts in issue." ***In re C.R.S.,*** 696 A.2d 840, 843 (Pa. Super. 1997) (citation omitted).

> In accordance with the overarching purpose of the Juvenile Act to preserve the unity of the family wherever possible, a child will only be declared dependent when he is presently without proper parental care and when such care is not immediately available. This Court has defined "proper parental care" as that care which (1) is geared to the particularized needs of the child and (2) at a minimum, is likely to prevent serious injury to the child.

***In re A.B.***, 63 A.3d 345, 349 (Pa. Super. 2013) (internal citations and quotation marks omitted).

On appeal, we review Mother's interrelated issues together. Mother argues that the evidence was insufficient to support the dependency adjudication. ***See*** Mother's Brief at 21-40. Mother asserts the Child is healthy and does not suffer from dental or medical conditions, and the Agency did not present contrary medical documentation. ***See id.*** at 23-25, 39-40. Mother rejects the court's finding the Child suffers from dental problems and contends that the Agency failed to correlate the Child's darkened teeth to any dental condition. ***See id***. at 39-40. Further, Mother contends she "t[ook] all of the steps necessary" to remedy the Child's dental concerns by attempting to schedule a dental appointment at two separate offices, but no appointments were available. ***Id***. at 34-37, 39-40. Thus, she claims, "circumstances beyond [her] control" prevented her from taking the Child to the dentist before the hearing. ***Id***. at 37-38. Mother further asserts the Child had medical examinations in 2023 and 2024, both of which revealed that he was "healthy."

*See id*. at 23-25, 39.  In the alternative, Mother asserts that she has in fact scheduled or attempted to schedule such appointments for Child which demonstrates present proper parental care.  *See id.* at 23-26, 34-37, 39-40.

Mother likewise challenges any assertion of substance use as a basis for dependency.  *See id.* at 26-33.  While admitting to Delta-8 use,[11] Mother disputes its relevance.  She asserts there was

> no testimony or evidence that even tangentially suggested that the child's health, safety, or welfare were at risk as a consequence of [her substance] use.  . . .  CYS did not raise any concern regarding the parenting of Mother as a result of her substance use.  The issue was not monitored by CYS through the implementation of ongoing substance tests.  There was no admissible evidence or testimony that Mother appeared under the influence while caring for her child.

*Id.* at 32-33 (footnote omitted).  Indeed, Mother highlights that, despite her positive drug and alcohol screens and admission to Delta-8 use, the Agency subsequently terminated its safety plan.[12]  *See id*. at 32.

The juvenile court provided the following explanation for its dependency finding:

> In the instant case, this [c]ourt found that the Child was dependent because of Mother's failure to properly care for the Child's physical health.  At the adjudication hearing, the [c]ourt heard extensive testimony from [Ms.] Clark . . . who was assigned to the interest of the Child.  This testimony was highly concerning and indicated that the Child was not receiving adequate care for

_____

[11] Mother testified Delta-8 is a readily available, legal form of marijuana.  **See** N.T., 7/29/24, at 41, 45, 48.

[12] Ms. Clark confirmed that the Agency ended its safety plan at the end of March 2024.  **See** N.T., 7/29/24, at 10.

his physical health. For instance, Ms. Clark testified that upon first meeting with the Child at his school after CYS opened its investigation, she noticed that the Child's teeth "appeared to be blackish toward the roots." When Ms. Clark asked the Child if he had been to the dentist recently, he stated that he had never been to a dentist.

Ms. Clark testified that during each of her other school visits, the Child appeared exhausted, with dark circles under his eyes. During these visits, the Child told Ms. Clark that he had been feeling extremely tired, that he thought this was due to an issue with his liver, and that Mother had not yet scheduled a doctor's appointment to address the issue. CYS later learned that the Child had been seen by a doctor at Mount Nittany - Penns Valley in 2023, but that the records from that visit indicated that there were concerns of malnutrition and a recommendation for the Child to see an eye doctor and dentist.

Furthermore, the testimony at the hearing indicated that there is evidence that Mother and other family members in the home regularly use controlled substances that may place the Child at risk. On March 7, 2024, CYS received another referral regarding concerns as to the Child's teeth and that Mother appeared to be under the influence while at Mount Nittany Medical Center with the Child. Additionally, on March 27, 2024, and April 18, 2024, all three family members - Mother, Maternal Grandmother, and Maternal Aunt - tested positive for use of marijuana. After the April 18, 2024, drug test, all three family members stated that they would refuse to comply with any future drug testing. Although the family members told CYS that their use of legal "Delta-8" marijuana from convenience stores resulted in the failed drug tests, the [c]ourt cannot rule out the possibility that Mother and the other household family members are regularly using a controlled substance. Given the concerns about the Child's teeth and lack of appropriate medical attention, there is a reasonable possibility that any such use of a controlled substance by Mother and the household family members places the health of the Child at risk.

Additionally, the [c]ourt finds it significant that Mother placed the Child on a waitlist to see a dentist only *after* her extensive involvement with CYS. Given Mother's testimony that she failed to take the Child to the dentist based on her own examinations of his mouth, it appears unlikely that Mother would

have arranged for proper dental care absent CYS's intervention. That is even more apparent given that after the Child was seen at Mount Nittany - Penns Valley in 2023, the doctor recommended that he see an eye doctor and dentist. The same can be said about the fact that Mother took the Child to a doctor's appointment in the month prior to the adjudication hearing, but not at any previous point in 2024, even though the Child repeatedly complained of his exhaustion to CYS and asked Mother to make a doctor's appointment for him earlier in the year.

For these reasons, the testimony at the hearing was sufficient for this [c]ourt to find by clear and convincing evidence that the Child met the statutory definition of dependency under 42 Pa.C.S.A. § 6302. It is not clear, as Mother argues, that proper parental care is immediately available with Mother.

Juvenile Court Opinion, 10/14/24, at 6-8 (citations to record omitted, emphasis added).

We find no legal error in the juvenile court's decision. The record adequately supports the juvenile court's finding that Child was "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals." 42 Pa.C.S.A. § 6302. Mother testified that she was able to determine herself whether the Child needed to see the dentist and had not taken him to have his teeth examined for what she estimated was three to four years. The court itself had noticed the Child's "dark" teeth. Additionally, Mother only scheduled a dental appointment after the dependency petition was filed. Mother likewise failed to respond to the Child's repeated requests for medical attention to treat his chronic lethargy, and the Child's medical records indicated he showed signs of malnutrition. *See* 42 Pa.C.S.A. § 6302.

Mother's assertion that the evidence was insufficient because it did not include any medical documentation demonstrating that Child suffers from any condition fails. As the juvenile court recognized, "Under the Juvenile Act, there is no . . . evidentiary requirement that [a] petitioner call certain expert witnesses in support of its case. Rather, it is in th[e c]ourt's discretion to determine if the evidence presented by the petitioner is enough to adjudicate a minor child a 'dependent child' by clear and convincing evidence under the [Juvenile] Act." Juvenile Court Opinion, 10/14/24, at 8. Mother does not present any contrary authority.

The court appropriately relied on the testimony of Ms. Clark, whom it noted had "intimate knowledge of CYS's investigation and the circumstances of this case . . .", and whose testimony, along with that of Mother, supports a finding that Child was devoid of parental care and control. *Id.* at 8-9.

Additionally, the Agency received a March 2024 referral alleging Mother presented under the influence at Mount Nittany Medical Center, where Child was being treated for a fever while out of the home under a safety plan. *See id.* at 9, 24-25; Order of Adjudication and Disposition, 7/30/24, Findings of Fact, at ¶ 6. Thereafter, Ms. Clark testified Mother and the other adult family members in the household tested positive for marijuana on several occasions and admitted to Delta-8 use, then refused further testing.[13] *See* N.T.,

_____

[13] At the time of the subject hearing, while in the process of obtaining same, Mother did not yet have a medical marijuana card. *See* N.T., 7/29/24, at 41.

7/29/24, at 10-11, 41, 45-46, 48. Ms. Clark further stated that, upon learning of the Delta-8 use, the Agency expressed concern that it "could be laced with other substances" and that "they do not have a prescription for it." *Id*. at 10. The frequency of Mother's drug use could possibly explain her abdication of her responsibility for the Child's physical well-being.[14] Ultimately, the reason for Mother's dereliction is irrelevant: the dispositive fact is she failed to care for Child's physical health, which fully supported the juvenile court's determination the Agency proved by clear and convincing evidence the Child was dependent.

For the foregoing reasons, we affirm the juvenile court's order adjudicating Child dependent.

Order affirmed.

Judgment Entered.

_____

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/21/2025

---

[14] Additionally, her assertion the Agency's attention to the Child's welfare was a reason for her drug use is concerning.

- 14 -