J-S12015-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: A.T.C., FATHER | : | |
| | : | |
| | : | No. 3164 EDA 2025 |

Appeal from the Order Entered December 3, 2025
In the Court of Common Pleas of Chester County Criminal Division at
No(s): CP-15-DP-0000094-2025

| | | |
|---|---|---|
| IN THE INTEREST OF: A.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: A.T.C., FATHER | : | |
| | : | |
| | : | No. 3304 EDA 2025 |

Appeal from the Order Entered December 3, 2025
In the Court of Common Pleas of Chester County Criminal Division at
No(s): CP-15-DP-0000095-2025

BEFORE: McLAUGHLIN, J., SULLIVAN, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY McLAUGHLIN, J.:                    **FILED MAY 27, 2026**

A.T.C. ("Father") appeals from the orders adjudicating as dependent his

children, Z.C. (born July 2017) and A.C. (born February 2019) (collectively,

"Children"). We affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

On October 12, 2025, the Chester County Department of Children, Youth and Families ("Agency" or "CYF") filed an application for emergency custody of Children. At the time, Children were residing with L.C. ("Mother") and her paramour. Z.C. was slightly more than eight years old, and A.C. was approximately six years, eight months old. The court issued an emergency order placing Children in the temporary physical and legal custody of the Agency. The Agency filed a dependency petition on October 14, 2025.

After a shelter care hearing, a hearing officer made the following findings:

> On October 9, 2025, and October 10, 2025, reports were made with allegations of inappropriate discipline from Mother and her paramour and sexual abuse occurring among the children. A safety plan was implemented on October 10, 2025, and [C]hildren were placed with family members. The [C]hildren were evaluated at Commonwealth Clinical [Group] and participated in a forensic interview. While Mother testified that she has received paperwork for [endangering the welfare of children] charges, the court is not able to verify if Mother has been charged criminally. Multiple attempts were made to contact Father prior and after the safety plan with no avail, but Father did get information about the hearing and was present.
>
> On October 12, 2025, the safety plan resources notified [the] Agency that they were no longer a viable resource for the [C]hildren. The [C]hildren were placed in separate foster homes due to allegations of sexual abuse. This court finds that the Agency made reasonable efforts to prevent removal [from] the home and ensure the safety of the [C]hildren.
>
> Children are placed separately due to safety concerns.

Shelter Care Order, filed 10/21/25, at 1-2.

An adjudicatory hearing was held on October 30, 2025 and November 7, 2025. Agency caseworker Bridget Rice testified that Children were removed from Mother's care due to concerns of sexual abuse of Children by their older brother living in the home and physical abuse of Children by Mother and her paramour. N.T., 11/7/25, at 6-7. Rice stated that before placing Children in foster care, she called Father's phone number but "didn't have any luck finding anybody." *Id.* at 11. Rice testified that Father returned her phone call on the evening of October 12, 2025 and told her that he wanted Children in his care. *Id.* at 11-12. Rice explained that the court had already signed an order placing Children in foster homes, and that Father should appear at the shelter care hearing the next day. *Id.* at 12. After the shelter care hearing, Rice stated that the Agency could not "fully" look into Father as a placement resource. Rice explained:

> Q. [Counsel]: And so following the emergency hearing after that, were you able to look into [Father] as a resource?
>
> A. [Rice] No, not fully.
>
> Q. Why?
>
> A. We were able to request a background check. Our administrative team reviews that. They had some questions, which they asked me to follow up on with him. He didn't want to answer those. We also wanted to do a visit to his home just to ensure that, you know, he has running water, places for them to sleep, but he didn't want to do that either.
>
> Q. Okay. Does [Father] have children in his home?
>
> A. We understand he has a three-year-old and a four-year-old.

Q. Okay. And would there be an alternative place for those children to go if he were to have either [of Children]?

A. I honestly do not know.

Q. And tell me a little bit about that.

A. I mean, I understand that there is a paramour, a girlfriend, parent to those other children, but I don't know the situation. [Father] had also mentioned his mother as a possible person.

\*\*\*

Q. [Y]ou haven't been to [Father's] house, correct?

A. Correct.

Q. And you've identified some criminal record issues. Based on that, would you be comfortable sending one of these children to his care?

A. The Agency's practice is to see a home before children are sent there just to ensure they have proper sleeping arrangements. And in this case in particular, if there are younger children in the home, we'd want to ensure their safety as well.

*Id.* at 12-13, 32. Rice testified that there were no allegations of physical or sexual abuse in Father's home. *Id.* at 40-41.

A therapist at Commonwealth Clinical Group, Catherine Murphy, testified as an expert that in October 2025, she conducted a psychosexual evaluation of Z.C.. N.T., 10/30/25, at 12. Z.C. was eight years old at the time of the evaluation. *Id.* at 63. She stated that she reviewed the reports submitted by the Agency and met with Z.C. and Mother. *Id.* at 19. Mother reported that Z.C.'s older brother had been sexually abusing Z.C. for three years. *Id.* at 31, 34. These sexual behaviors "rang[ed] from fondling to penetrative intercourse." *Id.* at 31. Murphy testified that Mother reported that

Z.C. displayed several symptoms of sexual abuse, including hypersexuality, frequent bedwetting, masturbating in public, suicidal ideations, and acting older than her age. *Id.* at 32, 36, 39. Murphy opined that the situation was "very serious, very entrenched. Three years is a long time to be reinforcing these behaviors. The symptoms that we're seeing are pretty significant." *Id.* at 37.

Murphy recommended that Z.C. attend trauma therapy. *Id.* at 41. She further recommended that Z.C. have no contact with her siblings until "she has started individual trauma therapy and her willingness has been assessed." *Id.* Murphy testified that it had been reported that Z.C. and A.C. had begun to engage in sexual behaviors with each other. *Id.* at 42. She therefore recommended "that there should be some separation between all three [siblings], so they can all receive treatment and education around appropriate and inappropriate sexual behavior." *Id.* at 60. Murphy testified that "it is not uncommon for children to continue behaviors without treatment" and simply removing the older brother from the home would not alleviate the concern of the sexual behaviors continuing "because it's been very entrenched for three years." *Id.* at 59, 62. She also recommended that Z.C. not be placed in a home with children younger than she. *Id.* at 42.

Murphy lastly recommended that Children's caregivers, including the non-offending parent, "receive psychoeducation on signs and symptoms of sexual abuse" and "to develop a safety plan for the family, so that way . . . if they were to be reunited, there would be a safety plan in place to ensure that

there is no further -- that it lessens the risk of further sexual abuse in the home." *Id.* at 42-43.

Mona Hedayatfar, a licensed professional counselor at Commonwealth Clinical Group and accepted as an expert by the court, testified that in October 2025, she conducted a psychosexual evaluation of A.C. *Id.* at 81. A.C. was six years old at the time. *Id.* at 86. She stated that she reviewed the reports submitted by the Agency and met with A.C. and Mother. *Id.* at 114. Hedayatfar did not contact Father to interview him, and Father was not present for the evaluation. *Id.* at 114-15. Mother reported that A.C.'s older brother had been sexually abusing A.C. for three years. *Id.* at 93. Hedayatfar testified that Mother reported A.C. displayed several signs of regression common in children who are sexually abused, including thumb-sucking, stuttering, and bedwetting. *Id.* at 95, 96. Hedayatfar also stated that A.C. had reported to her that Z.C. had begun sexually abusing him, and Children's older brother's friend also sexually abused Children. *Id.* at 102. Hedayatfar testified that the abuse occurred "under Mother's watch" and there were no reports of sexual abuse when Children were in Father's care. *Id.* at 125, 132. Hedayatfar stated that A.C. told her that he had witnessed incidents of "physical aggression" by Father towards Mother. *Id.* at 122-24.

Hedayatfar recommended that A.C. not have contact with his siblings. *Id.* at 103. She pointed out that A.C. had been abused by both of his older siblings and believed that if Children were placed together, there would be a

risk of additional sexual abuse occurring. *Id.* at 103-04, 106. Hedayatfar

explained:

> A. [Hedayatfar] The reason for that recommendation is that since there's reports of sexual abuse occurring, we are -- I guess how I would start it is saying that with children who have experienced sexual abuse who haven't been in therapy before and haven't processed that trauma -- having them start that process first and discuss their willingness and readiness for having reengagement with their siblings is important. It's important to be victim driven, since for so much of this time with the sexual abuse, they have been victimized and haven't had that level of agency to be able to kind of make -- make decisions about what's happening in their life.
>
> Q. [Counsel] Okay.
>
> A. So it's more of a place of readiness of it.
>
> Q. Okay. Based on what you heard, if the children are placed together, do you believe that there would be a risk of additional sexual abuse occurring?
>
> A. I believe so, yes. Since [A.C.] has reported both -- both [Z.C.] and [A.C.] have reported sexual abuse from their older brother and [A.C.] has reported sexual abuse from his sister.

*Id.* at 103-04.

Hedayatfar further recommended that A.C. not be permitted to be in

contact with younger children because children who have been sexually

abused but have not processed it through therapy "can reenact those

behaviors on younger children." *Id.* at 106-07.

Father testified that he found out about the case the night before the

shelter care hearing when Rice called him. N.T., 11/7/25, at 55, 60. He stated

that he informed Rice that he wanted to take Children, but Rice told him to

come to court the next day. *Id.* at 60. Father testified that he lives in a two-bedroom duplex with his paramour and two children, ages three and four. *Id.* at 50, 69. He stated that he wanted Children to live with him because he "needs [his] kids" and "[t]hat is the best thing for them." *Id.* at 72-73. He stated that he worked full-time in landscaping and snow removal. *Id.* at 52-53. Father testified that he and Mother had an informal custody arrangement where he would usually get Children every weekend and for an extended time in the summer. *Id.* at 57-58. When Children were at Father's house, they would sleep together in one bedroom or sleep in Father's bedroom. *Id.* at 77. Father said that Children never informed him that they were being physically and sexually abused at Mother's house. *Id.* at 56, 62. He testified that he never observed any sexual activity between Z.C. and A.C. or with his younger children. *Id.* at 65.

Father testified that if Children were placed in his care, he would enroll them in school, get them into treatment, and get them back into an everyday schedule. *Id.* at 63. He stated that he is willing to undergo education about child sexual abuse and the trauma it causes to children and parents. *Id.* at 84. He was aware of Z.C.'s bedwetting but attributed it to a family history of bedwetting. *Id.* at 83-84. Although Father agreed that Children should be supervised, he disagreed that Children should be separated from each other. *Id.* at 74-75, 85. He stated that he would allow his younger children to remain in the home if Children were returned to him because he "feels[s] like [he could] adequately supervise them even though it's four of them and if they

were to sleep over." *Id.* at 74. Father stated that, if necessary, A.C. could live with him and Z.C. could live with his mother ("Paternal Grandmother"). *Id.* at 75, 86.

On cross-examination, Father acknowledged that he had a criminal history for giving false information to law enforcement, giving a false statement while attempting to purchase a firearm, and harassment. *Id.* 92-95. The harassment charge stemmed from an argument between Father and Mother. *Id.* at 104-05. Father also disagreed with Mother's claim that he only had Children once a month and did not see them in the summer. *Id.* at 89-90.

Paternal Grandmother testified that Father is an "excellent father," and she believed Children should be with him because it "is the best place for his children." *Id.* at 113-14, 120. She stated that Father's house is clean and has ample food and toys. *Id.* at 113, 120. Paternal Grandmother believed that Father was able to financially care for Children and take Children to medical appointments. *Id.* at 118-19. She agreed that Children need therapy and agreed to follow the recommendations of Children's counselors. *Id.* at 122-23. Paternal Grandmother testified that she would agree to keeping Children separated until it was clinically recommended to reunify them, and she would be comfortable with having Z.C. placed at her house. *Id.* at 123.

At the end of the adjudicatory hearing, the court stated:

> First of all, I'm going to say that my conclusion and position is that *Justin S.* is not met. And the reason is, in case there is a challenge – I'll put the reasoning. The reason

- 9 -

is it falls into the piece of [sic] is Father ready and able, both the ready and able piece, because the evidence must establish to the [c]ourt that Father is willing, able, and ready.

Willing? Oh, yeah. He's there. Is he sincere? Yeah, I believe that he wants to get involved with this. I'm not there to the point where –- because it relates exactly to the circumstances of the case, the type of abuse that has happened amongst the kids[.]

\*\*\*

So I think Father has got the -- and with his family, including with Paternal Grandmother, they've got resources. Yes. They could get there. Okay. But at this moment in time, I am hesitating to do that. And that's because the Agency has not been able to do their checks that are required under the law because their checks actually serve me the purpose or evidence as well [as] for me to be comfortable to do that because it's about the risk to the [C]hildren.

And the last thing I need is for these children to be injuring these two other children, the three-and four-year-old, under Dad's care. Even though Dad might have good intentions, something still could happen. We've had many cases where that has happened.

\*\*\*

[F]rom an objective standpoint, I don't know if [Father is] ready, and I don't know if [Father is] able to do that because when you deal with children who are sexually reactive or even they go to the point of perpetrating with other siblings, things can go south pretty fast.

***Id.*** at 139-43.

The court adjudicated Children dependent. The court ordered that Father's residence be assessed within 10 days of the hearing and deferred disposition. ***Id.*** at 145, 149-50.

At a disposition hearing on November 24, 2025, agency caseworker Juliet Petrin testified that she visited Father's home 11 days before the hearing and found it suitable. N.T., 11/24/25, at 12-13. She stated that she was unable to visit Paternal Grandmother's home because Paternal Grandmother was out of town, but Petrin had scheduled a visit approximately a week and a half later, on December 5, 2025. *Id.* at 14. Petrin testified that one child started therapy at Commonwealth Clinical Group the week prior to the dispositional hearing and the other child was starting therapy that day. *Id.* at 16. Petrin said that the Agency "would need to see some type of plan that Father has in order to keep the children supervised properly," including things like care before and after school, any babysitting arrangements, and sleeping arrangements. *Id.* at 17. Petrin stated that she discussed developing a safety plan with Father and Father "sounded confident" that he could implement the plan. *Id.* at 19. Petrin testified that if Paternal Grandmother's house is found acceptable, the Agency would allow Z.C. to go there and A.C. to go with Father if Father's younger children stay with their mother at a different apartment. *Id.* at 25.

Father testified that he wanted Children to be placed at his home that day. *Id.* at 40. He said that if necessary, Z.C. could be placed with Paternal Grandmother. *Id.* Father testified that his younger children would go to live with their mother at a different residence. *Id.* at 39. He stated that the younger children "would still come over" but would be "primarily" at their mother's other residence. *Id.* at 39. Father was "on board" with Children

attending therapy. ***Id.*** at 46. When asked whether he would follow the recommendation to have no contact between the siblings, Father replied, "Honestly, no." ***Id.*** at 51. Father pointed that Children go to school together and there is no guarantee that they would always be supervised at school. ***Id.*** at 43-44. Father testified that he would not need additional care before school because he goes to work after Children go to school. ***Id.*** at 48. He stated that Paternal Grandmother, his brother, or his girlfriend's mother could possibly care for Children after school. ***Id.***

At the end of the hearing, the court ordered that Children remain in foster care. ***Id.*** at 71. The court found:

> Father is willing to take Child[ren] and use Paternal Grandmother as resource if separation of Children continues to be needed. Father agreed to a home visit by the Agency on November 13, 2025. The home was adequate except for a few minor corrections (i.e. smoke detector batteries needed to be changed; the home needs a fire extinguisher). Paternal Grandmother's home visit is scheduled for December 5, 2025. The [c]ourt finds, however, that it is unclear whether Father at this moment is objectively ready and able to supervise and care for Child[ren] who [have] undergone a prolonged period of trauma. The window of risk needs to be managed, and a concrete plan developed to ensure Children can attend treatment; attend Philadelphia schools; attend medical appointments; and be supervised. Father offered promises but lacked a concrete plan to manage and supervise the window of risk.

Dispositional Order, filed 12/3/25, at 3.

As a result of the court's ruling, Father made an outburst and the following transpired:

- 12 -

Father grew frustrated with the [c]ourt's decision for Children to remain in foster care until Paternal Grandmother's home was deemed adequate and a concrete safety plan was developed and implemented. Father became loud, animated, talked out of turn, cursed at the [c]ourt, and aggressively walked around the courtroom. The [c]ourt ordered Father to leave the courtroom and felt it necessary to lock the courtroom doors to protect Agency and court staff. Father's attorney, with the aid of sheriff deputies, escorted Father out of the courthouse.

*Id.* As a result of Father's actions, the court ordered the following pertaining to Father's visitation with Children:

Father shall have liberal video conferences and phone calls with Child[ren]. All video conference and phone calls shall be supervised. Father's supervised visits are suspended due to his angry outburst and statements made on the record at this hearing. Father's supervised visits may be reinstated by agreement between CYF and GAL once CYF and GAL collectively determine that Father will not be a threat to supervisors.

*Id.* at 2.

Father timely appealed from the order of adjudication and dispositional order. Father raises the following issues on appeal:

i. Whether the trial court erred by failing to conduct the required non-custodial parent analysis and by misapplying controlling precedent, including *In re Justin S.*, 375 Pa. Super. 88, 543 A.2d 1192 (Pa. Super. Ct. 1988), in adjudicating the [C]hildren dependent despite Father being a non-offending parent who was ready, willing, and able to provide care.

ii. Whether the trial court erred and abused its discretion in adjudicating the [C]hildren dependent as to Father where the Agency failed to present clear and convincing evidence of parental incapacity, and where the adjudication rested on speculation, incomplete

- 13 -

investigation, and an improper shifting of the burden of proof to Father.

iii. Whether the trial court erred and abused its discretion at disposition by continuing foster care and rejecting placement with Father despite CYF's assessment that his home was safe and appropriate, and by failing to apply the statutory requirement to use the least restrictive, family-like placement under 42 Pa.C.S. § 6351.

iv. Whether the trial court violated Father's procedural and substantive due[ ]process rights by suspending Father's visitation without the findings required by law, by failing to identify any risk to the [Children]'s safety.

Father's Br. at 9-10.

Father first argues that the court erred in adjudicating Children dependent because there was no finding that Father was presently unable or unwilling to provide proper parental care. *Id.* at 20. Citing *In Int. of Justin S.*, 543 A.2d 1192 (Pa.Super. 1988), Father asserts that "[w]here a non-custodial parent is available, ready, willing, and able to provide care, dependency cannot be sustained as a matter of law." *Id.* In Father's view, "[t]he written adjudication recommendations and orders reflect that the adjudication was driven by uncertainty, incomplete assessment, and unresolved logistical concerns rather than by a determination that Father posed a danger to the [C]hildren or lacked the ability to care for them." *Id.* at 20-21. Father points out that there was no evidence of abuse in Father's home and "[t]he record contains no finding that Father was unfit, unsafe, or unwilling to care for the [C]hildren." *Id.* at 27-28. According to Father,

- 14 -

"[a]bsent such a finding, the statutory predicate for dependency is not met." *Id.* at 28.

Father further argues that the court impermissibly conflated adjudication and disposition. *Id.* at 30. He asserts that "Pennsylvania law draws a clear distinction between adjudication, which focuses on whether a child lacks proper parental care, and disposition, which addresses services and placement once dependency is established." *Id.* Father argues that the court erred in adjudicating Children dependent "based on unresolved planning considerations rather than proven parental incapacity[.]" *Id.* at 31. Father urges this Court to vacate the adjudication of dependency. *Id.*

We review orders entered in dependency cases for an abuse of discretion. *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). "[W]e will accept those factual findings of the trial court that are supported by the record because the trial judge is in the best position to observe the witnesses and evaluate their credibility." *In re S.J.-L.*, 828 A.2d 352, 355 (Pa.Super. 2003). "We accord great weight to the trial judge's credibility determinations." *Id.* "Although bound by the facts, we are not bound by the trial court's inferences, deductions, and conclusions therefrom[.]" *Id.* (citation omitted).

A child is a dependent child if he is "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental or emotional health, or morals." 42 Pa.C.S.A. § 6302. "The question of whether a child is lacking proper parental care or control so as to be a dependent child encompasses two discrete

- 15 -

questions: whether the child presently is without proper parental care and control, and if so, whether such care and control are immediately available." *In re M.T.*, 101 A.3d 1163, 1173 (Pa.Super. 2014) (*en banc*) (citation omitted). "This Court has defined 'proper parental care' as 'that care which (1) is geared to the particularized needs of the child and (2) at a minimum, is likely to prevent serious injury to the child.'" *In re A.B.*, 63 A.3d 345, 349 (Pa.Super. 2013) (citation omitted).

The "burden of proof in a dependency proceeding is on the petitioner to demonstrate by clear and convincing evidence that a child meets [the] statutory definition of dependency." *In re M.T.*, 101 A.3d at 1173 (citation omitted). Clear and convincing evidence is defined as evidence that is "so clear, direct, weighty, and convincing as to enable the trier of facts to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *In re A.B.*, 63 A.at 349 (citation omitted).

If "a non-custodial parent is ready, willing and able to provide adequate care to a child, a court may not adjudge that child dependent." *In re M.L.*, 757 A.2d 849, 851 (Pa. 2000). In *In Int. of Justin S.*, this Court stated:

> [I]t is the duty of the trial court to determine whether the non[-]custodial parent is capable and willing to render proper parental control prior to adjudicating a child dependent. If the court determines that the custodial parent is unable to provide proper parental care and control "at this moment" and that the non-custodial parent is "immediately available" to provide such care, the child is not dependent under the provisions of the Juvenile Act. Consequently, the court must grant custody of the allegedly dependent child to the non-custodial parent. Once custody is granted to the

- 16 -

non-custodial parent, "the care, protection, and wholesome mental and physical development of the child" can occur in a family environment as the purpose of the Juvenile Act directs.

*In Int. of Justin S.*, 543 A.2d at 1200 (citation omitted).

Here, the record belies Father's contention that the adjudication was entered without a finding that he was presently unable or unwilling to provide proper parental care. The court made specific findings pursuant to *In Int. of Justin S.* that Father was willing to provide proper parental care but not objectively ready or able to at the time of the adjudication. *See* N.T., 11/7/25, 139-44. The court was concerned about the trauma caused by the prolonged sexual abuse of Children and Father's testimony that "he would allow ongoing sibling contact, [including with his younger two children,] which was in direct contravention to the recommendations of Commonwealth Clinical Group." Trial Court Opinion, filed 1/2/26, at 17. The court explained:

> The alleged sexual abuse, which included acts from fondling to penetration, had been occurring between the older half-sibling and the [C]hildren for three years. Eventually, the two younger siblings began engaging in sexual activities with each other, and they were also exposed to sexual activities through media. That prolonged period of trauma has resulted in concerns for each child. Z.C. is experiencing significant levels of post-traumatic stress, including exhibiting developmentally inappropriate sexualized behaviors and preoccupations as well as toileting difficulties that comport with chronic sexual trauma. A.C. is experiencing severe levels of post-traumatic stress and exhibiting significant mental health concerns of inattention, depression, mania/hyperactivity, psychosis, anxiety, and repetitive thoughts and behaviors.
>
> For both [C]hildren, there is a significant risk that they may continue to engage in sexualized behaviors within the

sibling group and with other children without the necessary treatment and education for the whole family to increase the family's protective capacity. The evaluations recommended the continued separation of all siblings until therapeutic services have been established with therapists with whom there is a strong rapport.

\*\*\*

The hearing officer was [] persuaded by the Commonwealth Clinical evaluators' testimony regarding the importance of maintaining separation in their ongoing treatment of the [C]hildren. In this case, sexual abuse and inappropriate sexual activity had been ongoing for three years, and the [C]hildren needed to work with individual therapists with whom they had a strong rapport so they could process feelings when contact with their sibling[s] resumed. Further, temporary separation during the initial treatment phase ensures that there would be no issues regarding secrecy bonds and that the [C]hildren would be educated on appropriate and inappropriate sexual behavior.

\*\*\*

[A]s of the date of the adjudication hearing, the [C]hildren had experienced three years of sexual abuse, and they required a heightened level of supervision and an immediate engagement in trauma treatment before resuming contact with each other. . . . In examining the evidence, including Father's testimony and the testimony of Paternal Grandmother, the [c]ourt could not conclude without hesitation that Father was immediately available to care for and protect the [C]hildren.

It is important to note that Father's position that he was a non-offending parent is misplaced; he assumed that because the sexual abuse did not occur while he had custody of the children, the [C]hildren were not at risk with him. Father fails to recognize that there is an ongoing threat that the [C]hildren could continue to abuse each other absent robust supervision, targeted education, and treatment.

*Id.* at 7, 13-16.

The record demonstrates that the court conducted the required non-custodial parent analysis and correctly determined that Father was not immediately able and ready to care for Children at the time of the adjudicatory hearing. The court properly considered the particularized needs of Children and found that Father lacked insight to ensure the safety of his children. Since the record supports the court's adjudication of dependency, we discern no abuse of discretion.

Father next argues that the Agency failed to present clear and convincing evidence of parental incapacity. Father's Br. at 17. He contends the Agency's case against him "rested largely on speculation, incomplete investigation, and concerns about future planning rather than evidence of present parental incapacity." *Id.* Father argues that the Agency's failure to complete its investigation against him does not equate to evidence of dependency. *Id.* at 35-36. Father maintains that "[t]he reasoning underlying the adjudication demonstrates an impermissible shift of the burden of proof" because "[r]ather than requiring the Agency to prove that Father was unable or unwilling to provide care, the adjudication effectively required Father to demonstrate readiness to the court's satisfaction before dependency would be denied." *Id.* at 36. Father concludes that "[b]ecause the adjudication as to [him] was based on incomplete investigation, speculative concerns, and an improper shifting of the burden of proof, it was not supported by clear and convincing evidence as required by" the Juvenile Act. *Id.* at 38. We disagree.

As set forth previously, the Agency produced several witnesses and evidence in support of its case at the adjudicatory hearing. Rice testified that after the shelter care hearing, the Agency requested to conduct an assessment on Father's home, but "he didn't want to do that[.]" N.T., 11/7/25, at 12. She stated, "The Agency's practice is to see a home before children are sent there just to ensure they have proper sleeping arrangements. And in this case in particular, if there are younger children in the home, we'd want to ensure their safety as well." *Id.* at 32. Rice also testified that Father refused to answer the Agency's follow-up questions after a background check. *Id.* at 12. Two licensed professional counselors testified that they conducted psychosexual evaluations on Children and determined that Children were victims of sexual abuse. Both counselors recommended no contact between the siblings because the risk of sexual abuse reoccurring was high. *See* N.T., 10/30/25, at 59-60, 62, 103-04. The court found both counselors credible and placed great weight on their testimony. Trial Ct. Op. at 12-13. Father testified that he would not follow the counselors' recommendations to keep Children separated while they underwent treatment. *See* N.T., 11/7/25, at 74-75. A review of the record indicates that the court did not abuse its discretion in finding that the Agency presented clear and convincing evidence that Children were dependent because they were without proper parental care and control at the time of the adjudicatory hearing.

In his third issue, Father argues that the court erred by failing to apply the statutory mandate to select the least restrictive, family-like placement

under 42 Pa.C.S.A. § 6351. Father's Br. at 38. Father asserts that "[t]he Juvenile Act requires the court to select the least restrictive placement that is consistent with the child's safety and welfare and to give preference to family-like settings over institutional or foster care placements." *Id.* at 39. Father points out that the dispositional order did not find Father's home was unsafe, unfit, or inappropriate. *Id.* at 40. He also highlights that the order "does not identify any specific risk posed by placement with Father or by placement in a family-based setting." *Id.* In Father's view, the order "reflects that foster care was treated as the default placement, rather than as a last resort justified by necessity," which "contravenes the Juvenile Act's express preference for maintaining family integrity and minimizing state intrusion." *Id.* at 47.

Once a court "finds that the child is dependent, then the court may make an appropriate disposition of the child to protect the child's physical, mental and moral welfare, including allowing the child to remain with the parents subject to supervision, transferring temporary legal custody to a relative or a private or public agency, or transferring custody to the juvenile court of another state." *In re M.L.*, 757 A.2d at 850-51 (citing 42 Pa.C.S.A. § 6351(a)). "[A] decision to remove a child from his or her parents' custody must be reconciled with the 'paramount purpose' of preserving family unity." *In re A.L.*, 779 A.2d 1172, 1175 (Pa.Super. 2001) (citation omitted). Before a child may be removed from his home, Section 6351 provides, in relevant part:

**(b) Required preplacement findings.--**Prior to entering any order of disposition under subsection (a) that would remove a dependent child from his home, the court shall enter findings on the record or in the order of court as follows:

(1) that continuation of the child in his home would be contrary to the welfare, safety or health of the child; and

(2) whether reasonable efforts were made prior to the placement of the child to prevent or eliminate the need for removal of the child from his home, if the child has remained in his home pending such disposition; or

(3) if preventive services were not offered due to the necessity for an emergency placement, whether such lack of services was reasonable under the circumstances; or

(4) if the court has previously determined pursuant to section 6332 (relating to informal hearing) that reasonable efforts were not made to prevent the initial removal of the child from his home, whether reasonable efforts are under way to make it possible for the child to return home; and

(5) if the child has a sibling who is subject to removal from his home, whether reasonable efforts were made prior to the placement of the child to place the siblings together or whether such joint placement is contrary to the safety or well-being of the child or sibling.

42 Pa.C.S.A. § 6351(b).

Here, it was clear that continuation of Children in Mother's home would be contrary to the welfare, safety or health of Children due to the sexual abuse occurring there. Rice testified that when Children were removed from Mother, she called Father and left him a voicemail. N.T., 11/7/25, at 10. She stated that she did not hear from Father, so the Agency proceeded with the safety plan due to the urgency of the matter and Children were placed separately with Mother's mother and sister. *Id.* However, two days after Children were placed, Mother's mother and sister informed the Agency that they no longer

could care for Children. *Id.* at 10-11. Rice testified that she then called Father again but could not reach him. *Id.* at 11. She stated that "we tried to get other possible places, including again their father. We called that same number we had again, and we didn't have any luck finding anybody." *Id.* The Agency then obtained an emergency court order and placed Children in foster care. *Id.*

The dispositional order specifically found that "Child[ren]'s placement is the least restrictive placement that meets the needs of Child[ren] and there is no less restrictive alternative available, in that the foster home provides a family-like environment." Dispositional Order at 2. The order also stated that "[j]oint placement with sibling(s) is contrary to the safety or well-being of Child or sibling(s). Specifically, Child and sibling have been sexually active with each other. A psycho-sexual evaluation completed by Commonwealth Clinical Group recommended that Child and sibling not be housed together." *Id.* at 1-2.

The record thus supports the conclusion that the court properly conducted the least restrictive placement analysis. Father's third claim is without merit.

Father's final claim is that the court violated his due process rights when it suspended his in-person visits without identifying any risk to Children's safety or welfare. Father's Br. at 48. He argues that a parent may not be denied visitation "except where a grave threat to the child can be shown." *Id.* (quoting *In the Interest of M.B.*, 674 A.2d 702, 705 (Pa.Super. 1996)).

Father points out that "the order does not contain any finding that Father posed a safety risk to the [C]hildren, that visitation endangered their physical or emotional welfare, or that continued contact constituted a grave threat." *Id.* at 50. He maintains that the sole reason his visits were suspended was due to his outburst at the end of the dispositional hearing. He argues that "[t]he Juvenile Act does not authorize the suspension of parental contact as a sanction, a behavioral response, or a case-management tool." *Id.* at 50-51.

Parents have "a constitutionally protected liberty interest in visiting a dependent child." *Int. of R.H.*, 320 A.3d 706, 713 (Pa.Super. 2024). "That right, however, is not without limits." *Id.* This Court has explained:

> The polestar and paramount concern in evaluating parental visitation, in dependency as well as non-dependency situations, is the best interests and welfare of the children. Once a child is adjudicated dependent, the issues of custody and continuation of foster care are determined according to a child's best interests. Thus, it has been said that the sole concerns of a court called upon to enforce a parent's right of visitation are the welfare and best interests of the child.
>
> However, because of the constitutionally protected liberty interest parents have to such visitation, parental visitation is usually not denied or limited unless visitation with the parent poses a grave threat to the child.

*In re C.J.*, 729 A.2d 89, 94 (Pa.Super. 1999) (cleaned up).

Here, the court explained its reasons for temporarily suspending Father's in-person visits:

> Father's due process rights were not violated when his supervised visits were temporarily suspended; the pause was specifically tailored to address his potential threat to visitation supervisors. If the supervision is disrupted and the

[c]ourt is not assured that Father can adequately supervise the children, then the children are under great risk[.] Father has a pathway to resume visits when he can demonstrate that he would not be a threat to the Agency or other supervisors. The [c]ourt's order gave the Agency and GAL the collective ability to agree on the resumption of supervised visitation upon their determination that Father would not be a threat to the Agency or other professional supervisors without returning to court, and the resumption of visitation, including changes to future visitation, will continue to be assessed at the next permanency review hearing. The suspension of in-person visitation is short term, and Father can continue to have video or telephone contact.

Trial Ct. Op. at 18-19.

We agree that Father's due process rights were not violated. The court limited Father's visits with Children and did not prohibit visitation entirely. Father could still have telephone or video contact with Children. Further, the suspension was temporary and was aimed to protect the safety of Children and their supervisors. The record supports the court's finding, and we perceive no error.

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: May 27, 2026